Environmental Protection Agency et al. Mr. Baer and Mr. Walker for Petitioners, Ms. Purdy for the Respondent, Ms. Chuse for Respondent Intervenors. Good morning. Good morning, Your Honor. May it please the Court, my name is Douglas Baer, Counsel for Petitioners. With me at the Council table is my partner, Jean-Cherieu Walker, who will be sharing this argument with us. Before I start into the argument, I just want to make sure the Court is aware that yesterday the government filed a joint motion to sever and stay the challenge to the non-vinyl chloride total air pollutant emission limits for new and existing area sources and to hold that matter in abeyance pending ongoing settlement discussions. And for that reason, we will not be addressing those particular limits that were addressed in our brief. I will be addressing, in introduction, I'll be addressing Petitioner's challenge to the non-vinyl chloride total organic hazardous air pollutant standards for new and existing major source wastewater emissions and the emission limits for PVC combined vents and the proper remedy that the Court should grant in this case. Mr. Walker will be addressing the remaining limits that are addressed in our brief. Just for the sake of clarity, I would just mention that I'll probably use the term wastewater, but when I do, I'm referring to the non-vinyl chloride total hazardous air pollutant wastewater standard. It just doesn't trip off the tongue all that easily. Because Petitioners are not challenging the standard set for wastewater emissions of vinyl chloride. In fact, that is probably one of the largest benefits that this rule provides, and that's not being challenged. Petitioners seek review and vacate certain limits of the 2012 EPA Clean Air Act regulation of the polyvinyl chloride and copolymer source categories. In the alternative, we're seeking a stay of those provisions in order to preserve Petitioner's right to judicial review. Without relief from this Court, regulated facilities will be required to comply with these admittedly unlawful regulations in five months. That is by April 17th, 2015. Do you agree that we have authority only to stay for three months? I don't think so, Your Honor. And you rely on the APA? Well, in part, we do. We think, yes, under the APA. And what else? I think under the Court's inherent authority. I see. Okay. I would just note, Your Honor, that in terms of a stay of longer than three months, first of all, the government has conceded that the Court has the authority to grant a stay, and has not in any way indicated that it believes that that's an option. I was just looking at the statute. I'm sorry? I was just looking at the terms of the statute. All right. Well, the stay that we're seeking is not a stay because of reconsideration. The Court is aware we've argued that the reconsideration has been completed. But more importantly, it's a stay to preserve our rights to judicial review. And the APA clearly gives the Court the authority to do that. And the Court has, in fact, granted stays in two cases, one of which is the Portman-Cement case. The Court granted a stay out of the emission limits, certain emission limits, based on the finding that they would be expensive to comply with and likely to change. Won't you get an opportunity to have judicial review when the EPA issues a final rule after reconsideration? The simple answer is yes, but it will be a different rule. Right now, we are confronting the 2012 rule. And the 2012 rule requires every facility in these categories to be in compliance by April of 2015. If that isn't stayed, then the appellate review of that is moot because we've got no choice. We're facing enforcement actions. We're facing citizen suits. We're facing possible criminal prosecution if we are in violation of those regulations. And why wouldn't the correct avenue be to go into District Court claiming unreasonable delay under Section 304A? Well, first of all, because we didn't know there was a delay that was going to affect the date, the compliance date, until about February of 2014. At that point, I suppose it's too late to go into District Court. And the only relief the District Court would provide is that the agency complete the reconsideration, which wasn't going to be the relief that we needed. We also think that this Court has the authority to grant a stay, as it has previously done in, I believe it's New York v. EPA in the Portland CEMET 2011 decision. And I think it's important, Your Honor. This is still in the wastewater, right? Well, it's on the wastewater and the PCV, PVC combined vent limits, both of which are subject to reconsideration. On the wastewater, they're okay with vacate or stay. So, I don't know that there's a huge dispute on that. Is that correct? I'll ask them, then. Well, no. The EPA is okay with vacate or stay of the wastewater limits. Right, on wastewater. The interveners are not. I understand that. Just for EPA. Nobody's made a concession for the PVC. I understand that, too. I'm sorry. Okay. Yeah, just on wastewater, EPA is fine with vacate or stay. I know interveners are not. Correct. That is correct. Okay. As I noted, we're here under highly unusual circumstances because EPA has offered no relief from the 2012, 2015, excuse me, compliance date for the regulations, even though they've admitted that certain of these provisions are flawed. They admit that they failed to provide opportunity for comment on the wastewater and process vent limits. They further do not... They don't admit that that's a legal flaw. They don't admit that they were legally obligated to do that. The statute requires them to do it. The statute requires that they give notice and allow comment on every regulation they adopt. Well, they... Originally, you had notes and comment. Now, they're in a reconsideration period, as I understand that position. Well, they had a proposal. Then, they issued the final rule. The final rule was not an outgrowth of the original proposal. It was entirely different for wastewater. It was... Originally, it was, I think, 1,000 ppm limit. It was then changed and divided for area sources and major sources and based on total hazardous air pollutants. So, we had no notice of that. And with the PVC combined, they had not set separate limits in the proposal. They set a separate limit for PVC combined based on data that they obtained through another proceeding, which they had not used for any other purpose. And which didn't go into the record until two days or maybe two weeks, I think, before the rule was finally cleared and published. So, we didn't get the opportunity to comment. They granted reconsideration, acknowledging that we didn't get the opportunity to comment. And I'd point out, Your Honor, it's not... It's more than just comment. Clearly, with the wastewater, it was to comment and correct that we weren't... And they acknowledged that, as well, because they admit that... So, they were collecting more data. They're analyzing the data. Then they'll put out a proposed revised rule, and you'll have an opportunity to comment. Our position, Your Honor, is that's a different rule. That they were in the process of making a new rule... Let me say, we're jumping around here. You said you wanted a stay, so we got off on a stay. Now, we're talking about... I thought Judge Pillard's question was pointing out that the reconsideration, your view is that it's, as a matter of law, over. But EPA takes a different point of view, and that you would have the opportunity, under EPA's point of view, to comment. That's correct, but it won't be a comment on this rule, on the 2012 rule. I understand. And the 2012 rule will be in effect, and we will be subject to compliance requirements, until such time as a new rule is adopted. Not even just proposed, but adopted, which, at the moment, EPA estimates will be June of 2016. So, for over a year... Is that going to affect everything in the rule? No, I don't think it will affect everything in the rule. I didn't think that was your argument. It will affect at least the wastewater limits, the PVC bent limits, is what they're collecting data on. A lot of data on the PVC combined bent limits is being collected. So, clearly, those two, which are the subject of our request for review, will be changed. But I would just note, the reason why we argue that this has been completed is, you know, the statute does not define what the reconsideration process is. This court in New York said, based on, essentially, a linguistic analysis, that it has to mean the completion of the reconsideration process. But that process is very minimally defined in the statute. It's not defined by regulation. What the statute requires is that when the administrator convenes a proceeding for reconsideration of the rule, you should provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. Well, actually, we're beyond proposal. We're now... The rule was adopted. So, the question is, what procedural rights were we denied when the rule was adopted? We were denied the opportunity to comment, as they acknowledged in the letter that they granted reconsideration. Right. But the letter isn't framed quite as broadly as you suggest. As I understand it, one of the industry-regulated parties submitted some information to EPA that should never have been submitted. All right? You never got a chance to comment on that. Right. And EPA relied on it in the rule. So, the administrator granted reconsideration as to that. All right. Well, as to the whole set of limits. Because that particular data point was the only data point used to set the waste water limit for new major sources. And it was identified as one of the five best-performing facilities in setting the existing major source waste water limit. So, it clearly was important. What they didn't do, and what the statute seems to require, is they didn't give us the process, the procedural right, that we were denied by the lack of notice and comment. Because they haven't asked for comment on the rule that we have to comply with next April. In fact, they said in the letter for reconsideration, we intend to publish a federal registered notice initiating public review and comment of the issues for which we are granting reconsideration. Period. That's it. The Joint Appendix 401, it's in every letter they sent. They've never done that. Not in this case. They've done it in other cases. In fact, in other cases, they've issued proposed rules at the same time they've granted reconsideration. The reason they didn't do that is because they don't want comment on this rule. You said this rule in that last sentence. The 2012 rule. Okay. The one we're required to comply with. Right. The combined. You're talking about the combined. All of it. Right. We had comment on some aspects of it. In some aspects, as often happens in administrative agencies, they change from the proposal to the final. And that's why they're saying you can have reconsideration on some issues. And that's why they're also saying you can vacate the wastewater because they made a mistake in how they changed it. Right? That's correct. Okay. Can you explain to me, Mr. Bair, how the, the, whatever it is, the ZOC that's coming out is measured? I gather that your case is in part, well, we're producing more per unit of hazardous air pollutants in the snow stack, and because we're producing more, you know, we should be deemed to be more efficient. And the rule doesn't measure for that. Is that roughly fair? I don't know the chemistry in the facilities as well as Mr. Walker, but he can probably give you a technical answer. Let me explain what I think, what happened here. When you look at the new, what EPA is regulating in wastewater is 30 different hazardous air pollutants. And so the wastewater is sampled. It's analyzed for each of those 30. They're totaled, and the total has to be below the limit. The problem is that limit was set for new major sources based on one data point for one hazardous air pollutant. Right. If we're talking about the process fence, though, I suppose that's an argument that you were making about the process fence. Okay. The process fence we think the limit is probably too small, too low, because in part, EPA has to look at the five best performing facilities. One of those facilities is the erroneous data point from the oxy, oxy vinyls plant. That your client provided. That we provided. That issue is not before us, right? What, the new major? The problem of fence, that it's too low, that's not before us. Well, our argument is that it's improper. It is illegal. It is arbitrary and capricious. Right. Yes. I'm just explaining. I think it's more of a question that it's too low than we think. If it was too high, it wouldn't be a problem. We wouldn't have to be here. Right. But that's not the gist of the complaint about the not recognizing the difference between absorbers and oxidizers was that the way that your client was releasing hazardous air pollutants was maybe in a high concentration per X. And what I'm asking is just what is the X? And that, yes, that may be a high concentration, but that in fact the productivity in the plant that corresponds to that emission is much higher. And therefore, it should be given a break. It's more efficient. It's better for the environment. And I was just trying to get a better sense of what is the measurement. Because I think part of EPA's response was, well, we don't have really an alternative methodology. So I was trying to understand what is the existing methodology. I'm sorry, Your Honor. I misunderstood. I was talking about the PVC combined, which is where emissions from a vinyl chloride plant are combined with emissions from a PVC plant. Your question, I think, is better directed to Mr. Walker, who plans to talk on that. All right. Why don't we hear from him? So I'll turn it over to him. May it please the Court, I will address EPA's failure to subcategorize bent gas absorbers or the alternative to provide an alternative limit format for that technology. I'll also address the conflicting and unachievable provisions concerning bypasses and, as well, the arbitrary and capricious and unachievable pressure relief device requirements. With regards to your question about the bent gas absorbers, the issue is that the agency is measuring emissions from process vents on the basis of concentration. It's an attempt to normalize the concentration of HAFs and to compare across thermal oxidizers or control devices that may be sized similarly. The problem with the bent gas absorber is that, first of all, it's not a combustion technology. It basically is an absorption technology that uses isooctane to absorb vinyl chloride. The second issue is that it operates intermittently. Although the machine operates continuously, the flow of HAFs is intermittent and very low. So what you have as a result is potentially a very high concentration when you're measuring the stream, but for a facility that, in actuality, when you take the flow and you multiply it by the concentration, is the best performer for hydrochloric acid, best performer for dioxins, best performer for vinyl chloride, and is third or fourth best performer, so in the top five for all pollutants. So from our standpoint, the reason the agency, and we think the agency did not take a very close look at this, but also the problem is that their approach in terms of discussing and stating that they're looking at emissions rather than processes is that it ignores, I think, the fundamental issue that lumping thermooxidizers to make bent gas absorbers create. So, I'm sorry, so they don't measure concentrations over a period of time? You said that the flow concentrations are over time or over volume, or what's the measure? It's typically parts per million volume over an hour, typically. And I'm sorry, Mr. Bair, you did say at the beginning that wasn't your issue, and I think it was my observation that I was quizzing you about it. So they measure over an hour, and your, just in comments in terms, your position is that that might be an hour of heavy, because it's intermittent? Well, the concentration is, I mean, what they do is they measure over 30 days, if I recall And they, in essence, come down to a value or standard that is parts per million per hour. That concentration, while normal or consistent across the devices, is not in actuality consistent, because if you look at the concentration, the bent gas absorber would have a very high concentration from the standpoint of that measurement, but in its actuality, when it's operating on the annual basis, its emissions are lower than the other facilities. And so from... If it's operating on a what basis? In other words... Annual? Yes. What the agency does is it sets the limit on a concentration, on the concentration basis, whether it's parts per million per volume or parts per million over a set period of time. In calculating the benefits and costs of the rule and sort of the emissions reductions, it then takes that data and multiplies it by the actual flow rate of the device. And so you have this incongruous situation where this is a device that arguably does not meet the limit because it's a concentration limit, but when you look at the total emissions, it's in the top five. And so our position is that the agency should have done... We don't take... We don't take a... We don't object to the agency's position that it has discretion. However, that discretion is not unfettered, and the court is allowed to review the agency's discretion. And what should it have done that it did not do? Well, the agency indicates that it could have, or it might have, instead of subcategorizing, which was our initial ask, created an alternate format. In other words, rather than measure by concentration, measure by mass. Measure the actual amount that comes out. All right, but they chose this... Have you completed your answer to Judge Pillard's question? Yes, I have. Yes, I have. So switching to the subcategorization, EPA, looking at the Joint Appendix at 102, it responds to the comments, and it says why it decided to proceed with these two subcategories and not go further. Yes, Your Honor. And we contend that the agency's response does not match the lack of analysis given the issues presented by this technology and the disparity between the concentration on the one hand and the actual emissions on the other. So it says it's talking about this volumetric outlet flow. Yes, Your Honor. And that is focusing on what goes into the atmosphere. Yes, Your Honor. That's correct. All right. And then it says, while we recognize that a vent gas absorber, which are covered vinyls, those absorbers also have stacks that emit into the atmosphere. And then they say, we considered setting alternative formats for the process. We did not have sufficient information provided from industry on process vent stream flow rates and concentrations to develop or evaluate other formats, such as mass emission rates. Yes, Your Honor. And that's an interesting response. All right. What's wrong with it? Well, first of all, we did provide stream flow rates to the agency. Indeed, we were able to calculate alternatives in our comments. I believe it's in the table. It's in your comments. It is in our comments. We provided the table that indicated how you could compare taking into consideration the stream flow rates. But the other interesting aspect of this is the agency then did use stream flow rates to calculate potential emissions or, you know, the emissions reductions from the rule. Even taking the agencies at face value, if this information is indeed insufficient, it doesn't provide enough information for us to provide additional information. And to sort of characterize the process... Well, can't industry sit down with EPA and figure this out? I mean, EPA says we acted on the basis of what we had. And certainly, Your Honor, I think the record reflects that we have been sitting down with EPA for quite a while and have provided... No, I understand that. Yes. I mean, you said we don't have enough information so we know what to provide. I think the issue that really hangs over this litigation is time. We have April and, of course, the length of time at the same time. All right. I understand time, but you said you were going to talk about three things, subcategorization, bypass, and pressure relief. Yes, ma'am. Yes, Your Honor. So I just wanted to understand what the error was as to the agency's response to the comments on subcategorization. Yes, Your Honor. And I think to the extent that we talk about these other issues, the timing, the pending compliance date, which is, again, five months away... Nobody wants to talk about them. I'm sorry, Your Honor? I understand the April. Okay. All right. All right? So with regards to the bypass provision, the rule allows the equipment facility to be opened... Right. ...for normal operations and maintenance. Right. During these opening requirements, during these opening procedures, there may be some HAPs released. Accordingly, the agency recognized that if you perform certain procedures and meet certain HAPs, you can go ahead and open the equipment. There's another provision in the rule dealing with bypasses, which states that... Which prohibits all bypasses from... And prohibits any diversions of emissions from the closed vent system. Our problem with this language here is that we see this as a conflict with the equipment opening provision. Now, the agency has tried to sort of address and correct that conflict by pointing out that what they mean by a bypass is something that it's after the gas enters the closed vent system. Right. The problem is that the definition of closed vent system in the rule is extremely broad because it defines the closed vent system as sort of the pathway to the control device from an emission point. An emission point is not defined in the rule. Indeed, we have to go to another map to see what that emission point means. And it's, in essence, any location from which an emission may be issued. So, our contention is that as the rule is written, we don't see how this conflict has been resolved. And we... And, you know, again, what this creates is a situation... Are you saying you don't know what you're supposed to do under the rule? Well, we don't know whether we can do what we're supposed to do, which is to basically purge our lines and then open our equipment. At this point in time, there's still a release of HAP. So, the problem becomes that under the MAC, historically for the PDC facilities, there's been a concept of in-HAP service, which means that equipment that's at a certain concentration is covered by the rule. Equipment at another... At a lower concentration is not. There's... Under this MAC, the bypass provisions apply whether the equipment is in-HAP service or not in-HAP service, according to the agency's discussion in the Federal Register preamble. So, at this point, we're in a situation where, you know, the agency talks about a regulated VET stream. We're trying to figure out whether it is regulated or it's not a regulated VET stream, and there's no clear language. What it comes down to is a HAP sentence, right? Bypasses are prohibited except after equipment opening procedures have been performed. It's taken two and a half years and we're still not there yet. I see that my time is up. You want to finish that thought? Yes. Yes, Your Honor. And so, we are not trying to defeat this rule or to operate and pollute the atmosphere. We have taken a very narrow and directed approach in terms of the provisions that we've challenged. These are the ones that we can't live with either because they create impossible limits for us to meet or they have...there are interpretational issues that require a change to the language of the rule, and we have not been able to get any sort of assistance at this point. So, just so I'm clear, what is the agency's error as to the pressure relief device requirements? The pressure relief device requirements, we don't object to that prohibition on pressure relief devices. The industry has operated on that prohibition for decades. The issue is the agency is requiring us to put in these release indicators, which in essence will, along when the release device goes off, will measure the duration that the device is off and it will... Doesn't that make sense to have that? Well, our position is that we in fact already have procedures and equipment in place at the facility to do this. Right. But EPA's response is it's reasonable to, you know, belt and suspenders or additional measures or ones they think are better, and maybe you could debate whether that's needed or not, but it doesn't seem unreasonable for the agency to want to do that. It might not have seemed unreasonable. However, under the statute, if they're going to proceed under a requirement that is beyond what is the current floor, the agency is required to conduct a cost-benefit analysis. That benefit necessitates the determination of... I thought that was only under 112C regulations, and not all of these are. Isn't that right, the cost-benefit analysis requirement? These are 112D requirements. The emission limits are 112D, and there is a requirement for cost-benefit under 112D. If it's beyond the floor. Okay. So at JA114, 115, that's EPA's response, and they talk about cost and benefit. And why is that insufficient or inadequate? Because the agency failed to establish need. Failed to establish need. To our mind, before you begin this document... We're already performing perfectly. We're not performing perfectly. No, no, no, no, no. This is my hypothetical. You're performing perfectly, and the agency comes along and says, now you have to install another piece of equipment. And your question is, why? Yes, Your Honor. And it's arbitrary and capricious for the agency to require that. That's correct, Your Honor. All right. Thank you. Give me some time on rebuttal. Oh, sorry. Excuse me. Just to be clear, if the regulation is under 112D2, cost-benefit analysis is required with 112D3. If it's not, what's your position? My position is that because the industry was operating under an existing prohibition, that wasn't the floor. And so the agency, by requiring more, went beyond the floor and should have conducted the cost-benefit analysis. I can't cite the specific provisions of the statute, but that's, in essence, our speculation. All right. Thank you. All right. Counsel for response? Yes. Good morning, Your Honor. Angeline Curry for EPA, and also with me is Mark Sadaoka of EPA's Office of General Counsel. I'd like to begin by discussing what issues are and are not before the Court, and how the reconsideration process plays into all of this. Section 307 is quite clear. If an issue wasn't raised during the public comment period, it can't be raised on judicial review. And this Court has reaffirmed that principle just earlier this year. To the extent that petitioners are raising issues related to the wastewater limit, related to the PVC only and PVC combined process fence, those issues were not raised during comments. There's no dispute over that. They are undergoing reconsideration, and they are not properly before the Court at this time. On wastewater, you say you're fine with a stay or even vacater. Why? And why hasn't the agency done it on its own, if that's its position in this Court? I'm trying to figure out what's going on. If the Court concludes that it can reach that issue, we do not oppose limited release. We don't think the Court can reach that issue. But if the Court concludes that it can reach that issue, we don't oppose the release of a stay. You're talking about the new and major, because the area is off the table based on the motion to sever. Correct. And on the new and major regulation, do you have the authority in litigation to just let that flick on and go? When authorized by the client, I think we have the authority to say that we don't oppose a stay. The reason, to answer Judge Kavanaugh's question, the reason that we do not oppose that is because this is a unique situation. There is a data point in there that everyone acknowledges should not have been considered in setting a process wastewater emission limit. One of what? Five or six? I beg your pardon? In this case, not with the area limits, but with the new and major sources, it was one of several data points. And as I understand your methodology, its outlier quality was taken into account really quite minimized in terms of what the standard was that the EPA came up with here. I believe that's correct, Your Honor. And I believe that the major source wastewater standard, it actually, if you look at the record before the agency, the time that the agency acted, it was properly calculated. Nobody's contending otherwise. Well, it's not very far off even acknowledging the error. To make sure I understand, I'm sorry, Your Honor, do you mean if you removed that data point? No. Even understanding that there's an error in there, if you did the correct calculation or the calculation that you made, it's a very minor difference. If you simply recalculated the major source standard using the existing data before the agency and removing that single data point, yes, it's fairly close. But you have other data now, right? EPA has additional data that it has received on reconsideration, yes, and we don't yet know what the major source standard is going to be. So what are they supposed to comply with here in a few months? What's in effect in a few months in terms of the wastewater? What would be in effect, Your Honor, assuming that these, taking the area source standard out of the picture because it's the most... The major source. ...would be the existing major source wastewater limit. Even though you say it's flawed. I'm trying to figure out what the agency is doing. You're saying to us it's flawed. You're fine with a stay or even vacator. At the same time, don't consider it. At the same time, they have to comply with it or are subject to penalties. It's kind of a mess, it seems to me, and I don't really understand. Let me ask it this way. When's the reconsideration going to be complete? At this point, EPA anticipates issuing a proposal on reconsideration in April of next year, 2015, and completing reconsideration in approximately June of 2016. And let me see if I can straighten out the mess a little bit. Mm-hmm. This issue is not before the court. We think that under 307 and the normal process, what the court should do is decline to consider this issue, leave it to the reconsideration process. If the petitioners believe that that process is not proceeding expeditiously enough, their remedy is an unreasonable delay claim in district court. That's the way the process is set to work. Let's play that out so that this is not just a shell game. What would your response be to that in the district court? Assuming that they had provided proper notice and filed and we were responding to that in the district court, I think we would respond that under these circumstances where EPA has granted reconsideration, has gone out, has gathered additional data, there has been a great deal of back and forth. So no unreasonable delay. No unreasonable delay, yes. And in the meantime, they should comply with something that you admit is flawed. The agency does not acknowledge that the standard is flawed. Based on flawed data. There is a single flawed data point in there. As Judge Pillard pointed out, if you remove that data point, the standard would be relatively close to what it is now if you considered only the data before the agency at the time that it acted. Isn't that the way EPA has to function? It's a little unclear to me. There's all this sense of, well, there's newer or better or more nuanced things that the agency could be doing. But for an agency to function, there's always going to be some time lapse. My understanding was that the Clean Water Act required immediate compliance even before review of most rules. And necessarily, there's a little bit of roughness in terms of how perfectly tailored the rules would be. Is that wrong? A couple of issues there. In terms of the compliance date, the compliance requirements, yes, are established by the Clean Air Act. And EPA has some discretion to set what that compliance date is for Section 112 standards. But yes. You can postpone it by up to three years. Correct. Yes. Those standards are immediately expected. The compliance may be set as EPA did in this case, three years out. And we would agree that there is always going to be a certain amount of the agency has to act at some point. It has a record before it. It acts based on that record. The reconsideration process is what is designed to address the situation where new data comes to light, new information comes to light. And that is our position is that that process should play itself out and that the court should not be considering this challenge at this time. But because of these unique circumstances, because it's not a situation where it's simply more data coming in or somebody raising an entirely new data point, it is a data point that we know for a fact was mistakenly submitted and should not have been considered. Right. But it's largely, as I understand your metrics, largely the formula that you apply to data points you have largely minimizes the impact on the standard that you get it on. EPA's analysis, yes. I mean, that was analyzed the way that EPA normally considers the range of data that it has. Although this was, I mean, you're correct that yes, the effect of this particular data point on the standard was minimal as far as we can determine at this point. And that's why we believe it's appropriate to allow the reconsideration process to play out, not to consider this issue. If the court concludes that it should reach this issue, it's appropriate to reach this issue, rather than allowing the normal statutory process to play out. So we're not opposing limited relief of staying that stance. And on what authority would we grant the stay? I believe that under either APA 705 or the court's inherent authority, the court does have authority to do that. In your statute we have, say, authority limited to three months. Under the Clean Air Act, yes. But there is also authority... Is it a wastewater limit? The Clean Air Act doesn't apply? That's something that confused me a great deal as well, Your Honor, until I got an explanation. The wastewater limit, it actually is a Clean Air Act standard because hazardous air pollutants can volatilize into the air. So the Clean Air Act does apply. It's a Section 112 standard. Right. But I thought you were saying that three-month limitation doesn't apply for some reason. Oh, no. I beg your pardon. The stay authority under Section 307 of the Clean Air Act is a three-month stay authority. But the court also has authority to stay rules depending on the conclusion of judicial proceedings and it has an inherent authority, we believe, to stay the rule. So that is the source of the authority. Let me ask you, what is your response to the environmental petitioner's argument about the major area source? I'm sorry, Your Honor, specifically their argument that that should not... About the major sources, sorry. The major sources. In other words, EPA says, well, if we reach these issues, it's okay with vacators. Right? And the environmentalists say, no. Not as to everything. I apologize, Your Honor. I didn't quite hear that. Do you understand what the difference is between EPA and the environmentalists on vacators? Yes. All right. So explain it to me. The difference is, Your Honor, is that EPA has stated that if the court works its way all the way through the decision tree and concludes it can consider this issue, that a stay would not be sufficient relief. Ultimately, we do not oppose vacature of that standard. Environmental intervenors have taken the position that the court should not stay or vacate that standard, that it should simply remain in place. That's the distinction. Because... That's what I want to understand. In other words, what's the relationship here? The parties that filed this motion saying they're probably going to try to reach a settlement as to the area sources. Yes, Your Honor. Nothing said about the major sources. And indeed, we heard argument here as to why the rule ought to be vacated entirely as to the major wastewater sources as well. And I want to understand what is the relationship between the area and the major? The area and major source standards simply apply to different sources. I understand that, but my point is are they interrelated? Are they interconnected? Does the data... If you change one, does it affect the other? Oh, I apologize. I'm also not really sure what your position is in terms of your waiver of your procedural defenses, which, on the one hand, you seem to waive them. On the other hand, you seem to be asserting them. You're asking for a stay or vacature or not. It's really pretty unclear what your position is. I apologize, Your Honor, if I can address this sequentially now that I understand your question. The two standards are independent in the sense of one or another that you can apply one or the other. They're not legally related. They can exist independently of one another. Although they were set based on... Are they environmentally related? Environmentally related in the sense that both are addressing... In other words, to a non-expert like me, there's a difference between an area requirement and a major source requirement. I may be a major source in an area. All right? And I want to understand the relationship here between the two standards. Now, if you are going to vacate the area restriction, then does that mean the major source is also relieved of any restriction? In my hypothetical, in just a very simple way. Now, I think what you're going to say from your head shake is that as a major source, I would still be obligated to comply with the restriction, even if the area restriction was removed. That's correct, Your Honor, because an area source is a particular type of source. It's a type of facility. It's not a standard that applies to an area in the sense of... This standard covers a geographic area? Right. Why isn't your answer supporting the environmentalist position that there's no need to get rid of everything? Well, I would go back to our fundamental position, Your Honor, which is that the court shouldn't be reaching this issue at all. And in that sense, there is no need to get rid of everything. Beyond that, I think we get your argument. If we do get to this next step, I just want to understand what the agency's position is. The agency's position is that if the court does reach this issue because of these unique circumstances where we know that there's a flawed data point included in that standard, we don't oppose a stay or ultimately... Even though the flawed data point doesn't reach the major source? The flawed data point was used in the calculation of the major source... For both the major and the area? It was used for both the major and area sources, yes, Your Honor. And I'm sorry, Judge Pillard, you were asking for clarification of our position? Yes, because you said you were waiving procedural defenses, but when you're asserting procedural defenses, you're fine with applying the rule, vacating the rule, or staying the rule. And I'm really not sure what you're asking us to do. We are not waiving our procedural defense. The Environmental Innovators has taken the position that we're not pursuing this vigorously. We, in fact, are. We've argued explicitly that this is subject to the exhaustion requirement and the court shouldn't reach this issue. So we're not waiving that defense. You waived it with respect to the area sources. Only with respect to the area sources. We... We have moved to sever and stay that on the grounds that we're hoping for a negotiated resolution. Yes. But we are not waiving it with regard to... And release. With regard to release, if the court accepts any of the arguments that industry petitioners have offered, which we believe are invalid, why the court should reach this, we don't oppose the release of the stay or ultimately vacature. But that's just an if. The major source wastewater issue is not before us because it was not raised. Because it couldn't be raised in the original proceeding. Correct. It's being raised on reconsideration and that's where the timeliness of this comes in and I understand your position on that. And so your position is we should reach it. Correct. If it's unusually long the period of time that the reconsideration is taking. It's hard to say Your Honor. I think it has taken longer than people originally anticipated. But that is simply because of additional data issues that have arisen during the course of the proceeding and EPA's conclusion that it needed to seek more data in order to make an informed decision on reconsideration. So once the compliance date hits, it's EPA's current position that it's going to enforce compliance with a limit for major source wastewater that is admittedly based on flawed data. That has a single flawed data point in it. Yes, Your Honor. But yes is the answer. You're going to enforce that. If that standard stays in place, yes. What do you mean if that standard stays in place? It is in place. I should clarify the standard will be affected. Now EPA certainly has enforcement discretion whether they would exercise that discretion in fact to enforce the standards. Right. The Supreme Court said we can't rely on that. They said that vigorously the last few years. We can't rely on that as a basis for mitigating the effects of a rule. So your point is they will have to comply. That compliance obligation would be in place. Yes, Your Honor. I see that my time is up. If the Court has additional questions on any of these issues or some of the technical points that were raised, I'm happy to address those. Otherwise... You didn't get a chance to talk about the two different kinds of the absorbers and oxidizers. Absorbers and oxidizers. Could you quickly address why you didn't treat them differently at all? Quickly, Your Honor, EPA did not subcategorize those because regardless of the controls that are used to remove pollutants from air before they reach the atmosphere, EPA applies the same standards to the emissions once they actually hit the atmosphere and that's where these standards apply to the process then. So yes, there are different types of control devices that facilities may use as their option to remove those pollutants, but the same standards apply once the emissions actually reach the atmosphere. And does the measurement metric take account of what teachers here are complaining of that they have maybe more density of HAPs but their productivity per HAP is higher? If you're measuring over time and over years, are you not capturing that or what's your position on that? Your Honor, I confess that I am not fully familiar with all the layer details of exactly how the metric works, but I believe their fundamental argument is that we should have set some different format to really accurately reflect the performance of these devices. EPA explained in the record and I believe Judge Rogers has noted that we've simply, industry has not provided the data we would have needed to do that. So whether it would have been possible to craft something a little more finely tuned that actually reflects those differences in performance, industry didn't give us the data from all facilities that we would have needed to do that. So the format and the standard as they were adopted reflect the record that EPA had and the best judgment that it could make based on that record. If, back to the other issue, suppose the compliance state comes and someone doesn't comply on the theory that we're not complying with something based on flawed data, EPA brings an enforcement action. Their defense will be that the rule as the major source waste water is unlawful because it's arbitrary and capricious based on flawed data. How will you respond? I am loathe to predict how we would respond to a particular enforcement case but I think that certainly is a factor that EPA would consider and it is a factor that a court could consider if it ever got to the point of having to assess penalties. That does put the entity in the position of rolling the dice on that which is maybe what this statute requires. If this rule were vacated, what would be regulating emissions in the meantime? The PVC source category is subject to the pre-existing Part 61 NESHAP so there are some standards that would still apply there. They will not be left standardless and unregulated. It would simply be the new provisions of this rule that would not apply. I apologize, Your Honor. I don't know offhand the specific differences in standards. Back to Judge Kavanaugh's question. Presumably one of the defenses could be the defense on the merits. Namely that this data point had minuscule effect or something to that effect or that we've got new data and indeed etc. So the merits would be fleshed out at that point. I think that's true, Your Honor, and that's why I'm reluctant to project exactly what I would say in a particular case. Because the administrator's letter granting reconsideration is not the mea culpa that petitioners have suggested in their briefing. But rather that there are two aspects. One, the general point that if the agency relies on material and the affected parties haven't had a chance to comment on it, they have to be given that opportunity. And then second is the problem that industry submitted data that was flawed and the agency has to respond. And it's the latter that makes this case a little different from the previous cases from which I'm familiar. Yes, Your Honor. It's the latter point that is the distinction here. And we agree that this is not a you know, the Petitioner's Counsel has suggested that we've admitted error here. We have not. I'm just trying to get your sense of this. My take of what this statute and this has been clarifying this argument of what this statute accomplishes is essentially to withdraw the Abbott Lab's right to pre-enforcement review for issues that are subject to reconsideration and weren't in the original proposed rule. So you can't get pre-enforcement review and that's okay because you get it as a defense and an enforcement proceeding would be your position, I suppose. For those issues that were not raised during the comment period, yes, Your Honor. That's the way The effect of this, given the reconsideration period, is potentially a, yeah, okay. I understand. Further questions? Thank you. All right. Counsel for Respondent Interveners. Thank you, and may it please the Court. The discussion before the Court illustrates the You might want to take it to the microphone a little bit. Oh, excuse me, Your Honor. The discussion before the Court this morning only illustrates the importance of the careful and clear judicial procedure that the Clean Air Act provides for EPA's air rules, which is distinct from the traditional Administrative Procedure Act rulemaking process as this Court is well aware. And it begins with a clear bar on raising issues that have not been presented to the agency for good reasons. In part because not only does EPA need a chance to address those issues, but this Court needs an adequate record in order to perform a merits review. And importantly, on behalf of the You recognize the potential unfairness to a regulated entity of that, in the sense that they could be forced into the position of complying with something they think is unlawful or not complying and running the risk of significant penalties. Oh, Your Honor. Do you acknowledge that that's present under the scheme as you see it? Your Honor, I do not for at least two reasons. One, it doesn't usually work that way. Generally, there is review and there is an opportunity A keyword in your sentence is usually. That's correct. It sometimes does. Well, in this instance, it is also not unfair because we have industry petitioners who basically slept on their rights. They did not exercise the procedure that the Clean Air Act provides. They couldn't have commented on something that didn't appear until the final rule. That's correct, Your Honor, but they could have filed a suit seeking relief for unusable delay. And you think that would be meritorious? Your Honor, it's speculative, but I do think there is indicia in the statute that suggests that taking too long for reconsideration provides some time indicators for how long would be too long. One factor is the statute's clear prohibition on a stay beyond three months. Another indicator is how the Act generally requires rules to be promulgated two years after source categories are listed. There are many different factors. Do you think it's too long in this case? Well, Your Honor, in this case, part of the reason it has taken this long is because the polyvinyl companies did not submit adequate data, submitted erroneous data, and I think the Court has some record citations illustrating that. They're complaining of delay at the same time as they are attempting to bury the agency with new evidence well after it has requested data and after the final rule has come out. Even in the submission of the information to the agency that this particular data point was simply erroneous, they also provided additional information that responded to an information collection request that had a deadline well before that time and I think that's attachment one to their original stay motion if the Court would like to look at that. The Act as a whole provides a very important process which is not just to protect EPA rules and preserve this Court's resources to assure it only addresses issues on which there is a controversy and which it has an adequate record, but also to protect people who are living near toxic polyvinyl sources and are facing in this case have already faced over a decade of delay in having any protections apply beyond the vinyl chloride standards and to address Judge Pillar's question, those standards set limits only for vinyl chloride. So this Court's 2004 decision recognized that the first set of standards EPA promulgated for the polyvinyl sources was unlawful in part because they only set those vinyl chloride standards. So this rule provides protections from additional hazardous air pollutants that are toxic at extremely low levels. In fact, there is no safe level of human exposure to the carcinogens released and those are important concerns for the Court both in ensuring that it's applying the exhaustion bar which is mandatory and binding and this Court has strictly applied and also in considering any potential relief which environmental interveners oppose on all of the issues. I understand that you oppose any relief with respect to the new and major source wastewater rule, but to the extent that there were to be relief, you seem to argue quite strongly for vacature instead of staying and I just want to know a little bit why that is. Thank you, Your Honor. We submitted that argument only in regard to the area source wastewater limit, so I do want to clarify that we believe that the Court should deny any kind of relief, but to address the stay question, the Court has considered, you know, they are, the polyvinyl companies are now asserting that they are not seeking a stay pending reconsideration. That is the header of this argument section in our opening brief. It is clear that is what they're seeking and the relevant statute here does not provide for a stay. So our position is that the law is clear. It applies to both the Court and the EPA and the Court's precedent that has addressed that provision which is 7607b 7b has applied that language faithfully so in addition to the wet industries case you cited, there's an additional case I could point the Court's attention to Natural Resource Defense Council v. Riley 976 F. 2nd 36 page 40 to 41. I apologize that's not in the brief but it is a case where the Court recognized that that language clearly prohibits EPA from granting a stay while they rely on Portland Cement and on New York v. EPA. What's your response to those authorities? Well, Your Honor, in running from the plain language of the governing statute they're trying to point the Court to language that just does not apply here. The Administrative Procedure Act grants authority for a stay pending the conclusion of judicial review. The Court is now concluding its review. Regarding the reconsideration there is no final action yet. There is nothing for the Court to review. It's unclear whether there will ever be a case regarding the final action EPA takes on reconsideration. And so the EPA provision just does not apply. We don't know what authority Portland Cement referred to or, excuse me, was relying on. We do believe it's important for this Court to apply the relevant statutes and we pointed to some of the Supreme Court precedent regarding the importance of the Court exercising any equitable authority it does have within the bounds of the four corners of the statute. So these are the Longshore Miller Philip Morris examples. The bottom line is that if the Court does not apply the clear procedure the Clean Air Act provides and does not provide an incentive for polyvinyl industry petitioners in the position of polyvinyl companies to exercise their rights at appropriate times to participate, to provide data that is correct, we are concerned about really their view declaring open season on air rules that are designed to protect public health from highly toxic pollution. We know that Congress was concerned in establishing this framework in avoiding, ensuring that reconsideration did not delay the effectiveness of a rule and that both in Part B and Part C. And there is some legislative history recognizing that and what this could lead to and what we're especially concerned about with this say is that it's really in almost a no man's land. There is no merits review it allows indefinite delay of protection and it's outside of the bounds of the law. So you think Portland Cement though because it said EPA has conceded that it did not give sufficient notice of those standards has granted the request for reconsideration because EPA will now be receiving comments for the first time that standards could likely change substantially thus industry should not have to build expensive new containment structures until the standard is finally determined. What are we supposed to do with that language? Your Honor, we would urge the court to apply the statute as it is. We have to apply our precedent too. So we have to have a way unless we just ignore it which I don't think we're going to do. We have to have a way to explain or distinguish that. What do you suggest we write in the opinion? Well, by analogy Your Honor, this court recognizes that when a case does not address the court's jurisdiction it did not necessarily become precedent on whether the court had jurisdiction. Sometimes that's considered kind of a drive-by jurisdictional ruling. The court may reach an issue and later the court may realize well actually that's an area we didn't have jurisdiction. There's a limit on our authority. That's where you don't mention the jurisdictional issue at all. Here it's the issue that we're talking about is specifically discussed. They resolve it differently from how you think they should have resolved it and I'm just I take your point about the statute. This may be wrong. It didn't cite the statute perhaps but we have to follow it. Well, Your Honor, it is sometimes it happens the same way with the jurisdictional issue. The court doesn't address its jurisdiction it reaches an issue. Here the court didn't address the basis for its authority yet it reached the issue. Whether or not this is jurisdictional the stay provision in the Clean Air Act does clearly limit this court's authority not just the EPA's authority and so that by analogy the precedent on that would move this court to ensure that it does have authority to act and to make clear the potential authority and we don't believe that it should exercise any residual equitable authority it might have because of the clear intent of Congress embodied in the law. Um One of the things that the court was concerned about is the potential investment in new standard between I think it was a 110 parts per million if the erroneous data is considered or 112 parts per million if the erroneous data point were excluded. Do we have any information in the record about whether in order to comply with the slightly more demanding standard industries have to build new equipment or make major investments? Good question Your Honor. On the major source standard that's one of the real differences between data share for major sources and the area source standard because they provided some information for area sources and that's partly why we took the position we did there but here we have no evidence that they would need to do anything that wouldn't be at you know at worst an investment toward the ultimate reduction EPA is going to require. We don't know assuming this does change in some way how much reduction EPA will require but it is going to be legally required to set stronger standards and they haven't provided a sense of that. In our view there is no prejudicial area excuse me error on the major source existing source standard and the new source limit we also don't have any evidence that there is any source facing any kind of harm from that limit which relies on the erroneous data point. So there's major factual differences here between Portland Cements including the fact that in that case the court did deny a stay pending reconsideration on a different issue and recognized the lack of irreparable harm. So if Portland Cements somehow created a new test or somehow followed the equitable test it's clear that this court does not have before it evidence from the polyvinyl companies that they have an important four factor test for a stay and part of that of course is a consideration of the equity. We have here a balance that is heavily in favor of protecting people living near these sources from highly toxic pollution, protecting the public interest in having adequate review rather than this hybrid stay that includes no merits review and allows rules to be put on indefinite indefinitely and of course you have the additional equitable problem that they created this bed for themselves both by providing, dragging their feet in providing data, providing incorrect data and then not exercising the procedural protections the Act does provide. When you say that they provided incorrect data who are you referring to? Who's the they? Well I'm referring specifically to OxyVinyl on that erroneous data point. I believe that they are a member of the trade association here. You're using one company and then translating them into the they and saying they submitted incorrect data which strikes me as a leap. I apologize your honor. One company among the group submitted incorrect data. That's correct your honor and just to speak to a couple other questions if possible. There is no cost benefit analysis required under 7412 D2. I should recognize that we are talking about a floor which requires EPA to set standards based on the average emission limitation achieved by the best performing sources and then EPA must decide how to assure the maximum achievable reduction in hazardous air pollutants and at that point it's allowed to consider cost but that is different from cost benefits. So I just want to clarify for the court it's an important distinction and in this instance we have they haven't actually raised that issue for the pressure release device issue and pressure release devices and bypasses. These are really important provisions for monitoring under EPA 7414 authority to assure compliance and allowing the polyvinyl companies to obey those requirements would really run counter to this court's recognition that the Clean Air Act standards must apply continuously. EPA has a responsibility to assure compliance and it's attempting to fulfill that responsibility in those provisions. Anything further? One other clarification for the court EPA's brief on page 21 I think counsel for EPA just accidentally mismatched the date that it's proposed and this rule is currently intended to come out in June of 2015 and to be finalized by April just to clarify that fact for the court. Alright. Thank you Your Honor. Thank you. Alright so let's see helpful official's name Mr. Baird give you a couple of minutes. Thank you Your Honor I realize that I don't have much time and there are a number of questions that the court raised that I'd like to address but first of all in terms of the relationship of the erroneous data point to the calculation of the limits for existing sources and new major sources that's set out in footnote 9 of the government's brief. You can find it there. We submit that essentially the issue before the court is one of fundamental fairness. If the court doesn't review the court either needs to review these limits or if it doesn't review them it needs to stay them. Now the APA doesn't say... Even if Congress has set up a different scheme. Well Your Honor we submit that Congress didn't set up an entirely different scheme. Under the APA this court can issue... I'm in the clean air act. I know you are Your Honor but may I... The clean act... Okay I'll start there. The clean act guarantees us the right to judicial review. Provided Well at some point we get judicial review. We may have to wait for reconsideration but we get judicial review. The rule that goes into effect the rule for which we are seeking judicial review is the 2012 rule. Now APA and their reviewers have argued that this court cannot review that rule at this time. If the court decides that then the petition for review remains active before the court because the court will not have to address the merits. The court will always have said look you can't bring that now. That's not a jurisdictional decision as Judge Kavanaugh noted in UR and the Supreme Court confirmed. So what happens to the petition? The petition remains and under the APA then there are pending the pending review process. The review process has not been completed. And under the APA this court can stay a rule while until the review process has been completed. And we will have been denied review and it will be pending. Have you argued that you meet the tax frame reasonable delay under Sarah Clover's promise? Or can you sketch out how you meet that? Well under Portland Cement the court basically said that if there's a likelihood of a change of the limits that is irreparable harm because in the one case it found there was a likelihood of change and in the other case there wasn't. And the interesting point as far as we can tell that issue is never brief. The factors under Sarah Clover's promise have you addressed those? Do you think you meet them? Well that's a different issue isn't it? Whether the delay is unreasonable I mean your petition here is that the ordinary Clean Air Act procedure and sequence of events shouldn't be applied to because it's I think you said an issue of fundamental fairness. This is the first case that we're aware of where reconsideration is going to run past the compliance state. This is if it's not the first case it's one of a very few. I don't think we found one where rather than addressing the issues raised in reconsideration the agency has gone forward with section 114 data requests for the purposes of crafting an entirely new rule. In terms of the delay your the statute doesn't work. If EPA can basically string this process along forever there's no guarantee this will be over in April 2016. On the standard the standard for a stay here would require you to show irreparable injury right? And I think intervener said you hadn't shown that. Can you respond to that? Well we believe that the question really is is there a likelihood that the emissions standard will change? That's what Portland Cement speaks to. What would be your injury though? Just explain in common sense terms. You're going to have to comply with a standard that isn't going to be the standard. And that will cost you or what will happen? It will cost and some plants may not be able to meet that standard. And where will we find that record evidence? Right. How the plants would have to retool and some can't do anything. Where in the record do we find that? It's not currently in the record. It's not currently in the record. And I don't think it was in the record in Portland Cement either. Do you know that? Portland Cement the opinion itself refers to the need to install this equipment. I wonder where the court got that. I don't know your honor. Let's not entune the court. I'm not trying to entune the court. But clearly there's a cost of compliance. Okay you just said that. Clearly there's a cost of compliance. There's always a cost of compliance. Spell it out here. Do you have to build something new? Or we can have them come up. One of the big issues is co-polymer plants. No co-polymer plant. All the co-polymer plants are covered by these regulations but none of them submitted data. There's no data obtained from co-polymer plants in the creation of the rule. So those co-polymer plants are going to have to try to comply with the regulation. Well they had an opportunity. Why not? Because they were never asked for it. There's a notice put out. And these are plants that were well known by EPA. No no let's be clear counsel. There's an opportunity for comment but EPA publishes this notice in the Federal Register. And I don't see any indication that EPA said polymer plants need not submit comments. I mean let's be clear. We're talking about comments on the 2012 proposal. I know the 2012 proposed rule. What became the 2012 proposed rule. Alright so there's no evidence in the record you admit to show what your cost may be. And now you're telling us that the polymer plant had no opportunity to submit comments but they will have to comply with the 2012 rule. And I want to know what evidence do you have that EPA prevented them somehow from submitting comments? That's not my point your honor. I'm sorry. They could have submitted comments on the 1000 PPM limit that was proposed. And my understanding is they could have lived with that limit. But that's not the limit that was adopted. I understand that. And you said in your opening statement something about the final rule is not a logical outgrowth. I didn't see that in your brief. Well EPA hasn't claimed that it is. And given the fact that you've got a movement from such magnitude I think we've argued it. What other arguments do you have? Just wanted to point out to Judge Kavanaugh that the statute does not allow you to raise an issue in defense of an enforcement action. It could have been raised on direct appeal. So in terms of your question. Well then we'd have a real problem. You would never be allowed to raise an issue and you'd be penalized for it. I don't think that... Well that's just the language of the statute. I think this statute has some real quirks that don't necessarily... You don't want to take that position in case you're in an enforcement proceeding. Well all I'm saying is that's what the statute says and so it... Well it couldn't have been raised though. That's the point. If we went that route here we would be saying you couldn't have raised it in this pre-enforcement proceeding so therefore presumably that provision would not preclude you. So I have two questions to respond to things that either EPA or intervener said. One was you made your own bed with the false... not false, incorrect data. Can you respond to that? Yeah. The data collection here was faulty from the beginning. There was no actual emissions measured for wastewater because the agency didn't ask for it. They said give us what you've got on hand and what we came back... what the industry came back with is what we've got on hand is very limited data and most of it is engineers estimates of what's being emitted. But the incorrect data came from industry was I think intervener's point. The one piece. The other point is you shouldn't be penalized for that. In other words the flaw to the extent there's a flaw as Judge Pillard notes, to the extent there's a flaw, the flaw comes because of incorrect data provided by industry. And the flaw also becomes... Can we take that into account in the equities here or on the stay issue? I don't think so, Your Honor, because there's new data being collected. The agency admits that the limits are going to change. And I think that's the focus. It's not going to be 112 as opposed to 110. We don't know what the new limits are going to be because there are new plants being submitting data that have never submitted data in the past. There are additional data points from the plants that did submit and there will be an entirely new calculation. There will be potentially different plants identified as the five best performing and I think ultimately when you look at the way the limits were set EPA said that... I'm not sure what point you're making with that. The new rule may be even more demanding? We don't know what the new rule is going to be. We think it will be less demanding because of this one data point that was so incredibly low. But I think the point I want to make... The further point I want to make, Your Honor, I'm sorry, is that when you look at the way the limit was set, EPA relied on one data point to regulate 30 hazardous air pollutants for new major sources. That's the standard they set based on the one data point from Occupy. For existing major sources, they only had data points, six or seven I think, on three hazardous air pollutants and that's the data they used to set a standard for 30 hazardous air pollutants. My final question for you, you started by fundamental fairness on your reply but the scheme that EPA is proposing here and interveners are proposing is simply in essence to remove the Abbott Labs pre-enforcement review for a certain narrow category of issues that and why is that fundamentally unfair? That's how administrative law worked for a long time before Abbott Labs. Why in Congress sometimes removes the right to pre-enforcement review? Why is that fundamentally unfair to do that for this narrow category of issues and force you to raise it as a defense and enforcement proceeding? Well, in part because it's not entirely clear you can raise it in an enforcement proceeding. That would be fundamentally unfair. Or in a citizen suit and that would be the first point and the second point is I think your fundamental fairness. The point is we do take as a baseline now that you have a right to pre-enforcement review but I don't know that that's fundamental fairness is eliminated when you have that right to pre-enforcement review eliminated just by point on Abbott Labs there. Then Congress divides the schemes like that. But we think this scheme which guarantees us the right to judicial review that gives this court the authority to reverse a decision based on the lack of notice and comment all indicate that we're entitled to some relief at this point and just one further point on the unreasonable delay. I would note that part of the reason that EPA cannot make their original estimate of getting a proposed rule out before the enforcement date is that in early 2014 they identified two plants from which they had never received or sought to obtain data although they were aware of it. Thank you very much. Mr. Walker? Thank you Your Honor. I will be brief. I just want to address the issue of the wastewater limit with regards to the possible harm from the current limit. As my colleague alluded to, the agency collected only four data points for what is intended to be a total limit. The problem with the data collection does not stem from our failure to provide the data. The agency never asked for it because the record will indicate that it never considered anything other than a 1,000 ppm limit for vinyl wastewater limit. We did not know that we would have a total wastewater limit until the rule was finalized. You didn't know what? We would have a wastewater limit for non-vinyl total hazardous, total organic pollutants until after the rule was finalized. It was not possible to provide the agency with any data. What the data will show is that there are two issues within the data set that is not covered by this rule that the industry facilities face. The first is a notion that my colleague alluded to co-polymers. Co-polymers basically it's like if you're making dough, you're making pizza dough, you use flour and water and you have a particular product. If you're making a puff pastry, you use flour and butter. Butter is the co-monomer. It's the second ingredient that has a significant presence in the waste stream that the other non- co-polymer products, the homopolymers, which the agency recognizes for the strict resin limits, they don't appear. What we have in the current limit is a wastewater limit that recognizes the existence of homopolymers but no co-polymer. There is not a single co-polymer facility in the industry that can meet that 110 PPM limit right now, nor can one be designed. Is this the type of data that you will submit or have submitted to EPA on reconsideration? Yes, Your Honor. We have submitted it. We will submit the data within 20 days after we obtain that rule and we've submitted additional data sets. Thank you. Thank you.
judges: Rogers, Kavanaugh, Pillard